OPINION
On July 13, 2000, at approximately 8:45 p.m., 20-year-old Ronald Cline was at home in his apartment, peeling paint from his bathtub. He heard the doorbell ring. He looked out of the window, and saw a man that he did not know at the door. When he opened the door, he noticed that the man had a gun. The man ordered Cline to go back upstairs. The gunman followed Cline, and demanded money. Cline gave the gunman $5.00. While holding the gun to Cline's head, the gunman repeatedly demanded money. The gunman was not wearing a mask, and Cline had an opportunity to get a good look at his face. He also got a good look at the gun. Cline told the gunman that his neighbor had a safe in his apartment, in an attempt to get him out of the apartment and into an area where someone could see them.
The gunman put the gun in his waistband, and he and Cline proceeded downstairs to an apartment occupied by Fred Hinchcliff. The gunman remained behind Cline, holding onto his shirt. Approximately five minutes had passed from the time Cline first encountered the gunman, to the time they proceeded to Hinchcliff's apartment.
The main door to Hinchcliff's apartment was open, but the screen door was shut. Cline knocked on the door. Hinchcliff was sitting on his couch watching television. Cline told Hinchcliff, "Go get the safe." Hinchcliff replied, "What safe?" Cline repeated that he should go get the safe. The gunman then opened the screen door, and pushed Cline into the apartment. The gunman told Hinchcliff to get the safe. Hinchcliff responded that there wasn't a safe in the apartment. At this point, the gunman was holding the gun to Cline's head.
Hinchcliff's six-year old daughter came into the room. Hinchcliff told the gunman to leave or he was going to call the police. The gunman replied that he didn't care, and would shoot everybody. The little girl began to cry. Hinchcliff stood up, and began moving toward the door. He opened the door and pushed his daughter outside, telling her to run and call the police. Hinchcliff then exited the apartment behind his daughter. Hinchcliff had worked as a bouncer, and had deliberately concentrated on the facial features and expressions of the gunman. He believed that by looking at a person's facial expressions, he can tell what the other person is going to do, and Hinchcliff was trying to determine whether the gunman was actually going to shoot anyone.
The gunman began walking Cline to the back of the apartment. Cline grabbed the gun and a struggle ensued. The gun fired several times. Cline's hand was injured in the process. As the men struggled over the gun, they tripped over an extension cord, falling to the ground. Cline pushed the gunman off him and dashed into a bedroom, slamming the door. Another shot was fired. In all, four shell casings were recovered from the apartment. The gunman left and ran.
Hinchcliff returned to the apartment and found Cline in the bedroom alive. Cline was so upset that he went straight to his mother's home without waiting for the police to arrive. A short time later, he returned, giving the police a statement and a description of the gunman.
The next evening, Cline went to a nightclub in Jackson Township. While he was there, he noticed a man who he believed to be the gunman. He first identified the man by his hair, which was styled in cornrows. He maneuvered closer to the man, in order to see his face, and confirmed that he was in fact the gunman. The man was later determined to be appellant John Chavers.
The police arrived and Cline directed them to appellant. Approximately two weeks after the incident, a Canton police officer asked Cline to come down and look at a photo array. Cline would not cooperate, as he was fearful that something bad would happen to his family.
Approximately one month after the incident, Canton Police asked Hinchcliff to come to the station to identify the gunman from a photo array. After looking at six photographs, Hinchcliff selected appellant's photograph. Hinchcliff identified the gunman by his hairline, the height line of his cheekbones, and the size of his eyes.
Appellant was indicted on two counts of aggravated robbery, two counts of aggravated burglary, and one count of felonious assault, each within an attendant firearm specification. The case proceeded to jury trial in the Stark County Common Pleas Court.
Appellant presented four alibi witnesses on his behalf. His mother testified that she remembered the date in question, and she had to miss her Concerned Parent's meeting because she had to work. She testified that she came home from work on her lunch break, and appellant was baby-sitting her other two children when she left the home between 8:40 and 8:45. Two members of her Concerned Parent's group testified that they came by the house between 8:00 and 8:30 to see why appellant's mother was not at the meeting. They testified they stayed 10 to 15 minutes. Neither witness could put an exact time on when they saw appellant at the house. A fourth witness testified that she came by the house, and appellant was present at about 8:50 to 8:55.
Appellant was convicted on all charges. He was sentenced to 18 years incarceration.
Appellant assigns a single error on appeal.
 ASSIGNMENT OF ERROR THE JURY'S VERDICT'S FINDING APPELLANT GUILTY TO ALL OF THE CHARGES WERE NOT SUPPORTED BY THE EVIDENCE, OR IN THE ALTERNATIVE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, WHERE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT WAS PROPERLY IDENTIFIED AS THE PERSON WHO COMMITTED THE CRIMES.
Appellant argues the verdict is against the manifest weight and the sufficiency of the evidence. Appellant specifically argues that the State failed to prove beyond a reasonable doubt that appellant was properly identified as the gunman.
Sufficiency of the evidence concerns whether the evidence is legally sufficient to support the verdict as a matter of law. State v. Thompkins
(1997), 78 Ohio St.3d 380, 386. A conviction that is not supported by sufficient evidence violates due process. Id.
Weight of the evidence concerns the inclination of the greater amount of credible evidence offered at trial to support one side of the issue rather than the other. Id. at 387. Weight of the evidence is not a question of mathematics, but depends on the effect of the evidence in inducing belief. Id. The discretionary power to grant a new trial shall be exercised only in the exceptional case in which the evidence weighs heavily against conviction. Id.
In the instant case, the verdict is not against the sufficiency or weight of the evidence. Both Cline and Hinchcliff had an opportunity to view appellant in broad daylight, over a period of time, during the commission of the crimes. Cline identified appellant the day after the incident at a nightclub, and again during appellant's trial. While Cline initially noticed appellant due to his hairstyle, before notifying the police Cline maneuvered closer to appellant to get a look at his face. Hinchcliff identified appellant from a photo array, and again at trial. Hinchcliff testified that he deliberately studied the gunman's face during the incident. Hinchcliff was very specific about the facial features which caused him to identify appellant from the photo array, and testified that he was positive appellant was the gunman.
Further, the jury could reasonably have decided to believe the victims rather than appellant's alibi witnesses. One of the alibi witnesses was appellant's mother, and the others were friends. Further, the witnesses could only offer approximate times when they saw appellant at the residence, which was not far from the crime scene.
The assignment of error is overruled.
JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Stark County Common Pleas Court is affirmed. Costs to appellant.
Hon. W. Scott Gwin, P.J. Hon. William B. Hoffman, J. Hon. Sheila G. Farmer, J. concur.